**OIL, CHEMICAL & ATOMIC WORKERS INT'L UNION, AFL–CIO, et al., Plaintiffs,**

v.

**Federico PEÑA, Secretary of Energy and United States Department of Energy, et al., Defendants.**

Civ. A. No. 97–1926.

United States District Court, District of Columbia.

June 3, 1998.

Reuben A. Guttman, Provost Umphrey LLP, Washington, DC.

Kathleen Hostetler, General Counsel, Oil, Chemical & Atomic Workers Int'l Union, AFL–CIO, Lakewood, CO.

Brian McCafferty, Provost Umphrey LLP, Norristown, PA.

Barbara A. Finamore, Natural Resources Defense Council, Inc., Washington, DC.

Eric Fygi, Acting General Counsel, Washington, DC.

Scott S. Harris, U.S. Attorney's Office, Washington, DC.

Frank Casey/Kathy B. Houlihan, Morgan, Lewis & Bockius LLP, Washington, DC.

Michael Lempres, Pamela Bresnahan, Steven Becker, Vorys, Sater, Seymour & Pease, Washington, DC.

Jeffrey Hummel, Seyfarth, Shaw, Fairweather & Geraldson, Washington, DC.

Terry R. Yellig, Sherman, Dunn, Cohen, Leifer & Yellig, Washington, DC.

## MEMORANDUM OPINION

KESSLER, District Judge.

The Department of Energy ("DOE") and several of its contractors have undertaken the cleanup of a hazardous waste site at the Oak Ridge Reservation ("ORR") in Oak Ridge, Tennessee. ORR was for many years used for nuclear weapons research and development. Plaintiffs Oil, Chemical & Atomic Workers International Union, AFL–CIO ("OCAW"), OCAW Local 3–288, and several individual OCAW members (collectively "OCAW Plaintiffs" or "Plaintiffs") allege that the cleanup, or decontamination and decommissioning ("D & D"), should not proceed until the Defendants have promulgated an Environmental Impact Statement ("EIS"), which the Plaintiffs claim is required by the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) ("NEPA"). Plaintiffs also allege that the second phase of the project, the recycling and sale of recovered scrap metal, should not proceed until the DOE has issued an EIS to determine the environmental impact of that portion of the cleanup activities.

Plaintiff–Intervenors Natural Resources Defense Council ("NRDC"), Oak Ridge Environmental Peace Alliance, the Coalition for a Healthy Environment, and the Nuclear Information and Resource Service (collectively "NRDC Plaintiff–Intervenors" or "Plaintiff–Intervenors") present a narrower claim, namely that only a portion of the cleanup activities—the proposed recycling and resale of materials recovered from the site—is covered by NEPA and therefore should not proceed absent an EIS.

The OCAW Plaintiffs also allege that, since the cleanup activities at ORR require a major workforce restructuring, the DOE and its contractors are required to comply with the requirements of Section 3161 of the National Defense Authorization Act for Fiscal Year 1993, 42 U.S.C. § 7274h ("Section 3161"). Plaintiffs allege that DOE and its contractors

have failed to fulfill various Section 3161 obligations.

This matter is now before the Court on the Defendants' Motions to Dismiss Plaintiffs' and Plaintiff–Intervenors' Amended Complaints and Defendant Community Reuse Organization of East Tennessee's ("CROET") Motion to Change Venue and Motion to Sever the Claims Against It.

Upon consideration of the Motions, Oppositions, Replies, Surreplies, the arguments made at the Motions hearing, and the entire record contained herein, the Federal Defendant's Motion to Dismiss Plaintiffs' Amended Complaint [# 54] is **granted in part and denied in part**; Defendant British Nuclear Fuels, Inc.'s ("BNFL") Motion to Dismiss Plaintiffs' Amended Complaint [# 18] is **granted in part and denied in part**; Defendant CROET's Motion to Dismiss Plaintiffs' Amended Complaint [# 39] is **granted**;[1] Defendant CROET's Motion to Change Venue [# 39] is **denied** as moot; Defendant CROET's Motion to Sever the Claims Against It [# 64] is **denied** as moot; the Motion to Dismiss Plaintiffs' Amended Complaint [# 61] of Defendant–Intervenor Building and Construction Trades Department, AFL–CIO and the Knoxville Building and Construction Trades Council, AFL–CIO (collectively "Building Trades") is **granted in part and denied in part**;[2] Defendant BNFL's Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 80] is **denied**; the Federal Defendant's Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 81] is **denied**; and the Building Trades' Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 81] is **denied**.

## I. Background [3]

Plaintiff OCAW represents approximately 6,000 employees who work at DOE nuclear defense facilities. It is a national representative of collective bargaining units within the meaning of 42 U.S.C. § 7274h(b). Plaintiff OCAW Local 3–288 represents employees and former employees of the ORR facility who have worked for, *inter alia*, the management and operations contractor, Lockheed–Martin Energy Systems ("LMES"). Other OCAW Plaintiffs include employees and former employees at ORR.

### A. Section 3161 Claims

### 1. Workforce Restructuring at ORR

Whenever a change in the workforce at a defense nuclear facility is deemed necessary, Section 3161 directs the Secretary of Energy ("Secretary") to promulgate a workforce restructuring plan ("WRP") and thereafter issue an updated plan annually. 42 U.S.C. § 7274h(e). The OCAW Plaintiffs argue that, since the cleanup activities at ORR require a major workforce restructuring, DOE and its contractors are required to comply with the requirements of Section 3161.

1. CROET's Amended Motion to Dismiss or to Change Venue seeks dismissal only of Counts V and VI of Plaintiffs' Amended Complaint. Plaintiffs voluntarily withdrew Count VI of their Complaint on February 12, 1998 [# 116].

2. The Building Trades' Motion does not request dismissal of those portions of Plaintiffs' Amended Complaint that seek to enjoin the recycling and resale component of the cleanup activities. However, the Building Trades state that they seek dismissal of Counts II, IV, VII, and IX. (Building Trades Mot. to Dismiss OCAW Am. Compl. at 2.) Since portions of Counts VII and IX have survived the Defendants' Motions to Dismiss, the Building Trades' Motion is technically granted only in part.

3. For purposes of ruling on motions to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. *Shear v. Nat'l Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C.Cir.1979). Therefore, unless otherwise noted, the facts set forth herein that relate to Plaintiffs' Section 3161 claims are taken from Plaintiffs' Amended Complaint.

Pursuant to Local Rule 108(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." For reasons discussed below, the Court will consider those portions of Defendants' Motions that discuss Plaintiffs' and Plaintiff–Intervenors' environmental claims, not as Motions to Dismiss, but instead as Motions for Summary Judgment. Accordingly, unless otherwise noted, facts that relate to Plaintiffs' and Plaintiff–Intervenors' environmental claims are only those facts which the Court believes to be undisputed.

Section 3161 requires the Secretary to be "guided" by certain "objectives" when preparing the initial WRP. These "objectives" include providing terminated employees with hiring preferences "to the extent practicable". *Id.* at § 7274h(c). They also include providing retraining for those employees, also "to the extent practicable". *Id.* The statute requires the Secretary to consult with various groups in developing and updating the WRP, submit the WRP to Congress, and "work on an ongoing basis with representatives of the Department of Labor, workforce bargaining units, and States and local communities in carrying out a plan". *Id.* at §§ 7274h(b), (d) & (f).

The OCAW Plaintiffs allege that the DOE and its contractors have failed to comply with the requirements of Section 3161. Their primary concern is that the DOE and its contractors and subcontractors have failed to sufficiently provide for the continued employment and employment benefits of OCAW members.

Plaintiffs complain that DOE has improperly delegated to BNFL the DOE's Section 3161 obligation to implement a job preference for displaced ORR employees. They allege that this delegation is unlawful and violates their rights under Section 3161.

Plaintiffs claim that, even if BNFL does hire the individuals encompassed by the Amended Complaint, no plan exists to mitigate the impact of its D & D effort on the continuity of employees' pensions, benefits, and retiree health care.

## B. Environmental Claims

### 1. Statutory and Regulatory Background

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub.L. No. 96–510, 94 Stat. 2767 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601–75 (1988), was enacted to ensure the efficient cleanup of sites contaminated with hazardous wastes and other pollutants. CERCLA gives the federal government the power to either clean up a site and sue responsible parties for reimbursement (Section 104) or force a responsible party itself to undertake the cleanup (Section 106). Cleanup activities under CERCLA are generally referred to as "response" actions and are one of two types: a "removal action", which is a short-term remedy designed to minimize and mitigate immediate harm, or a "remedial action", which is intended to provide a permanent solution to remedy the threatened release of a hazardous substance. 42 U.S.C. §§ 9601(23) and 9601(24).

The President, pursuant to § 115 of CERCLA, has delegated to the Secretary of Energy certain CERCLA response authority for facilities under DOE jurisdiction, custody, or control. Before response action planning begins, the Environmental Protection Agency ("EPA") must assess the site. The EPA places sites on a National Priorities List ("NPL") of federal facilities included in the Federal Agency Hazardous Waste Compliance Docket according to their rank among other CERCLA sites in terms of potential threat to health and the environment. 42 U.S.C. § 9605. The EPA placed ORR on the NPL in November 1989. (Peña Mot. to Dismiss at 11, citing 54 Fed.Reg. 48184.)

Once a site is placed on the NPL, CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Part 300 (1996), impose various requirements that govern the course of any remedial work performed at the site.

In accordance with the requirements of CERCLA Section 120, the Environmental Protection Agency ("EPA"), DOE, and the Tennessee Department of Environment and Conservation ("TDEC") entered into a Federal Facilities Agreement ("FFA") for ORR. The FFA provides a comprehensive framework for remediating the environmental impact of past and present activities at ORR. (Ex. 3, Peña Mot. to Dismiss, Halsey Decl. ¶ 3, Att. A, "Federal Facility Agreement Under Section 120 of CERCLA and Sections 3008(h) and 6001 of RCRA" [hereinafter "FFA at ___"].)

The NCP, 40 C.F.R. Part 300 (1996), establishes procedures and criteria to be used in assessing remedial alternatives. 42 U.S.C. § 9605. Where a "non-time critical removal

action"[4] may be appropriate, the NCP requires the agency to prepare an Engineering Evaluation/Cost Analysis ("EE/CA") to assess the proposed action and alternatives. 40 C.F.R. 300.415(b)(4).

## 2. Planned Cleanup Activities at ORR

The DOE, with the concurrence of the EPA and TDEC, issued an Engineering Evaluation/Cost Analysis ("EE/CA") in July 1997 that compared and analyzed three alternatives for addressing contamination in three buildings (K–29, K–31, and K–33) at the Eastern Tennessee Technological Park ("ETTP") at ORR.[5] The EE/CA identified as the preferred alternative, "Alternative 2", which includes "equipment removal and building decontamination, includ[ing] the removal, collection, and transportation of recyclable materials (process components, piping, and equipment) to the private sector for recycling and processing for reuse." (Ex. 3, Peña Mot. to Dismiss, Halsey Decl. ¶ 7, Att. C, "Engineering Evaluation/Cost Analysis for Equipment Removal and Building Decontamination for Buildings K–29, K–31, and K–33, East Tennessee Technology Park, Oak Ridge, Tennessee", at 1–1 and 1–2 [hereinafter "EE/CA at ___"].) The EE/CA determined that the cleanup of the three buildings would be conducted as a non-time-critical removal action.

After a short public comment period, DOE submitted the EE/CA and an "action memorandum" to the EPA and TDEC requesting their concurrence on initiation of Alternative 2. DOE received concurrences from TDEC and EPA to proceed with the removal action in September 1997.

The OCAW Plaintiffs allege that the proposed cleanup should not proceed until the Defendants have prepared an EIS, which they claim is required by NEPA. NEPA requires federal agencies to issue a detailed EIS for major federal actions which will significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). Plaintiffs argue that NEPA requires an EIS to determine the environmental impact of the entire cleanup project as well as the proposed recycling and sale of ostensibly decontaminated but potentially radioactive scrap metal.

The NRDC Plaintiff–Intervenors focus their concerns more narrowly on the second phase of the project and allege that the recycling and sale of recovered scrap metal should not proceed until the DOE has issued an EIS to determine the environmental impact of that portion of the cleanup activities.

## C. The DOE–BNFL Contract

In August 1997, DOE awarded to BNFL a contract under which BNFL will remove all gaseous diffusion and related "process" equipment from Buildings K–29, K–31, and K–33 and decontaminate the remaining building surfaces and structures to meet prescribed cleanup standards. (NRDC Am. Compl. ¶ 22.) The equipment now located in the buildings contains approximately 126,351 tons of contaminated or potentially contaminated metals. The contract requires BNFL to complete the equipment removal and building decontamination no later than December 31, 2003. (*Id.* ¶ 24.)

DOE has given or will give to BNFL title to all property it dismantles or demolishes under the contract, excluding only property which DOE specifically designates it is retaining. (*Id.* ¶ 26.) The contract does not require BNFL to use any one specific method to dispose of the recovered property, which includes approximately 112,000 tons of contaminated nickel, aluminum, stainless steel, and copper. (*Id.* ¶¶ 26, 28.) Instead, the EE/CA, which the Federal Defendants

---

4. In non-time critical actions, there is a planning period of six months before initiation of the action. The EPA generally classifies removal actions as emergency, time-critical, and non-time critical. (Peña Mot. to Dismiss at 10 n. 2, citing EPA/OSWER Directive No. 9203.1–03, "Guidance on Implementation of the Superfund Accelerated Cleanup Model (SACM) under CERCLA and the NCP" (July 1992), incorporated by reference in "Guidance on Accelerating CERCLA En-

vironmental Restoration at Federal Facilities" (August 22, 1994), and EPA/540–R–93–057, "Guidance on Conducting Non–Time Critical Removal Actions under CERCLA" (August 1993).)

5. The ETTP was formerly known as the "K–25 site". The buildings subject to the cleanup project are the K–29, K–31, and K–33 Buildings at ETTP.

claim is the "definitive document setting forth the scope of the D & D project", Peña Reply, Mot. to Dismiss at 17, states only that "[d]isposition of equipment and scrap metal will take advantage of recycling, reuse, or unrestricted release *when possible and economically feasible.*" (EE/CA at 4–2 (emphasis added).) The EE/CA does require, however, that "[a]pproved waste facilities will be used to store or dispose of wastes." (*Id.*)

Plaintiff–Intervenors note that, although the DOE–BNFL contract is referred to as the "East Tennessee Technology Park Three–Building Decontamination and Decommissioning (D & D) *and Recycle* Project" (emphasis added), the contract itself only requires BNFL to remove the equipment and decontaminate the buildings, that is, to complete the "D & D" portion of the project. The contract does not require BNFL to recycle any materials or equipment removed from the buildings. DOE has instead given BNFL full discretion to determine what methods it will use to recycle the scrap metals or even whether it will recycle.

### D. The DOE–CROET Leases

CROET is a non-profit corporation principally financed by DOE. Its purpose is to assist the private sector in creating jobs in the Oak Ridge Region. (Mem. CROET Am. Mot. Dismiss or Change Venue at 2.) It enters into leases with DOE for portions of buildings at ETTP and in turn subleases these buildings to private firms. (*Id.* at 2–3.) CROET states that it does not hire or have any responsibility for individuals employed by the sublessors at these sites. (*Id.* at 3.)

The OCAW Plaintiffs claim that the DOE–CROET lease agreement requires CROET to use the leased space to promote work for individuals who have lost their jobs as a result of DOE's change in mission. Plaintiffs allege that CROET has ignored this obligation and "has become a cause of unemployment rather than a source of employment". (OCAW Am. Compl. ¶ 69.)

### E. The Building Trades

The Building Trades, which have historically represented employees at ORR who perform construction work, will enter into a collective bargaining agreement, or "project labor agreement", with BNFL covering all the construction work involved in the D & D at ETTP. Under the project labor agreement, BNFL will recognize the Building Trades as the collective bargaining representative for on-site construction work involved in the D & D and other related activities at ETTP. (Building Trades Mot. to Dismiss OCAW Am. Compl. at 3 (citations omitted).)

The OCAW Plaintiffs fear that, if BNFL enters into any subcontract concerning the D & D, Plaintiffs' hiring preferences and other rights which they claim under Section 3161 would be rendered "illusory". Plaintiffs thus seek to enjoin BNFL from awarding any subcontract which might lead to a preventable loss of employment for their members and for the individual Plaintiffs. (*See, e.g.,* OCAW Am. Compl. ¶ 126.)

The Building Trades have intervened because they oppose Plaintiffs' efforts to enjoin the implementation of certain provisions of the project labor agreement and the Building Trades's referral procedures. (*See* Building Trades Reply to OCAW Opp'n to Building Trades Mot. to Dismiss at 7.)

## II. Analysis

### A. Standard of Review

Under Fed.R.Civ.P. 12(b)(6), a complaint shall not be dismissed for failure to state a claim for relief unless "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Ordinarily, as already noted, the factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff. *Shear,* 606 F.2d at 1253. The Court will consider the OCAW Plaintiffs' Section 3161 claims under the above standard.

The Federal Rules of Civil Procedure require that if, on a motion to dismiss for failure to state a claim, the movants submit matters outside the pleadings which are not excluded by the Court, the motion must be treated as one for summary judgment and

disposed of in accordance with Rule 56. Fed. R.Civ.P. 12(b). Although Plaintiffs, Plaintiff–Intervenors, and Defendants discuss only Motions to Dismiss, the Court finds that adjudication of the environmental claims requires consideration of matters outside the pleadings, namely the many documents and exhibits submitted by the parties. These claims will therefore be considered under the summary judgment standard of review.

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the movant has met this burden, a court must consider all factual inferences in the light most favorable to the non-moving party (here, Plaintiffs and Plaintiff–Intervenors). *McKinney v. Dole*, 765 F.2d 1129, 1135 (D.C.Cir.1985). Once the moving party makes its initial showing, however, the nonmoving party must demonstrate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *McKinney*, 765 F.2d at 1135. Moreover, "[i]n determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Local Rule 108(h).

**6.** Our Court of Appeals, however, has stated that *Steel Co.'s* holding may not be as "inflexible" as the language of the majority opinion suggests. In *Democratic Senatorial Campaign Committee v. Federal Election Commission*, 139 F.3d 951, 1998 WL 163560, *1 (D.C.Cir.), the Court stated that "*Steel Co.* seems to hold that before deciding the

## B. Section 3161 Claims

### 1. Standing

▮ Defendants argue that neither OCAW nor the individual OCAW members who are Plaintiffs has standing to assert a Section 3161 claim. Since the merits of the Section 3161 claims are more easily resolved, the Court in the past might well have simply proceeded to decide that issue without struggling with the more difficult questions presented by Defendants' standing arguments. However, this practice of " 'assuming' jurisdiction for the purpose of deciding the merits", has recently been proscribed by the Supreme Court. In *Steel Co. v. Citizens for a Better Environment*, —— U.S. ——, ——, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998), the Court stated that "[t]he requirement that jurisdiction be established as a threshold matter... is 'inflexible and without exception.'" *Id.*, quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884).[6]

In order to establish standing to bring a court action, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), requires a plaintiff to meet three requirements:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is a) concrete and particularized... and b) actual or imminent, not conjectural or hypothetical... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly... trace[able] to the challenged action of the defendant... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Defendants claim that the individual OCAW Plaintiffs fail to satisfy the first and third elements of standing. They argue that Plaintiffs have suffered no injury in fact and

merits, federal courts must always decide Article III standing whenever it is in doubt. We say 'seems' because two of the Justices comprising the five-Justice majority on this point interpreted the Court's opinion as not setting down an absolute, rigid, unbending rule."

that any alleged injury would not be redressed by a favorable decision of the Court. Defendants also note that if an association's members would not otherwise have standing to sue in their own right, then the association does not have standing to sue on its members' behalf. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

### a. Counts I through IV

Counts I through IV of Plaintiffs' Amended Complaint all arise under Section 3161. Count I seeks a declaratory judgment requiring the Secretary to develop and implement an updated WRP for ORR consistent with the requirements of Section 3161.

Count II alleges that the Secretary has violated Plaintiffs' substantive due process rights under the Fifth Amendment of the U.S. Constitution by failing to implement Section 3161 and by abandoning and/or unlawfully delegating his statutory duties to private contractors.

Count III of Plaintiffs' Amended Complaint alleges that the Secretary has unlawfully withheld, or unreasonably delayed, promulgation and implementation of an updated WRP to address specific changes in the workforce.

Count IV alleges that the "DOE Defendant's abdication of its Section 3161 planning and implementation responsibilities to private contractors... is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law." (OCAW Am. Compl. ¶ 123.) [7]

Plaintiffs acknowledge that the Secretary has, in fact, promulgated a WRP for ORR. (OCAW Am. Compl. ¶ 47.) The plan was promulgated on November 29, 1995, and updated on October 26, 1996. (*Id.*) Plaintiffs allege, however, that both the initial and the updated WRP "remain[ ] deficient". (*Id.*)

Section 3161 states that, in preparing the initial plan, "the Secretary shall be *guided by the following objectives* ". *Id.* at § 7274h(b) (emphasis added). These "objectives" in-

clude providing terminated employees with hiring preferences "to the extent practicable". *Id.* at § 7274h(c). Plaintiffs assert that this language confers upon them "a property right to a hiring preference cognizable under the Fifth Amendment". (OCAW Am. Compl. ¶ 28.) The "objectives" also include providing retraining for terminated employees, also "to the extent practicable". *Id.* Section 3161 requires the Secretary to be "guided by" the same "objectives" when issuing updated plans.

The language used by Congress in Section 3161 (that the Secretary be "guided" by certain "objectives") gives enormous discretion to the agency as it prepares WRP's. The Supreme Court has stated that "even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

■ Because of the unconstrained discretion given the agency, Section 3161 contains no "judicially manageable standard" by which to judge the content of the Secretary's WRP. In the absence of such a "judicially manageable standard", it is clear that the statute commits the agency action (in this case, the preparation of the WRP) to "agency discretion by law" and is thus unreviewable pursuant to 5 U.S.C. § 701(a)(2); *see also Webster v. Doe,* 486 U.S. 592, 599–601, 108 S.Ct. 2047, 100 L.Ed.2d 632(1988).

■ The Court is unpersuaded by OCAW's argument that the 1996 "Interim Planning Guidance", 61 Fed.Reg. 8593 (March 5, 1996), demonstrates that Section 3161 requires a mandatory hiring preference for displaced workers. As the Supreme Court said in *Chaney,* "we do not think the language of the agency's 'policy statement' can plausibly be read to override the agency's express assertion of unreviewable discretion". 470 U.S. at 836, 105 S.Ct. 1649.

---

**7.** Both Counts II and IV seek injunctions barring the DOE and BNFL from engaging in any privatization or subcontracting and ordering the DOE to promulgate and implement an updated work-

force restructuring plan. OCAW bases these Counts on the APA, 5 U.S.C. §§ 702, 705, 706(1), and 706(2).

■ The absence of statutory standards makes it clear that the substance of the WRP is simply not reviewable under the APA. Although Congress intended to guide the Secretary's decisionmaking process by identifying "objectives" for his consideration, it drafted Section 3161 so that the terms of the Secretary's plan are committed to his unreviewable discretion.

■ Since the substance of the WRP is not judicially reviewable, the Court can issue no favorable decision under § 3161 that would redress the OCAW Plaintiffs' alleged injuries.[8] *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. Plaintiffs have thus failed to meet the third requirement for standing under *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130, and Counts I through IV of their Amended Complaint must be dismissed.[9]

For the foregoing reasons, the Motions of the Federal Defendant and BNFL to Dismiss Count I of the OCAW Plaintiffs' Amended Complaint will be granted; the Federal Defendant's, BNFL's, and the Building Trades' Motions to Dismiss Count II of the OCAW Plaintiffs' Amended Complaint will be granted; the Federal Defendant's and BNFL's Motions to Dismiss Count III of the OCAW Plaintiffs' Amended Complaint will be granted; and the Federal Defendant's, BNFL's, and the Building Trades' Motions to Dismiss Count IV of the OCAW Plaintiffs' Amended Complaint will be granted.

### C. Breach of Contract Claim
#### 1. Personal Jurisdiction
##### a. Count V

CROET has entered into leases with the DOE for portions of buildings at ETTP.

CROET then subleases to private firms those portions of the ETTP buildings which it leased from DOE. The contracts are executed and performed in Tennessee.

The OCAW Plaintiffs allege that they are the intended third-party beneficiaries of the lease agreements between DOE and CROET and of the sublease agreements between CROET and various private business entities. They claim that CROET has breached provisions in these leases which entitle Plaintiffs to preference in hiring by the sublessees. Plaintiffs seek an injunction barring CROET from entering into any further leases or subleases for DOE property at ORR until it complies with the provisions in the existing leases, an injunction requiring CROET to honor its existing leases and subleases, and compensatory damages. (OCAW Am. Compl. ¶ 131.)

CROET argues, *inter alia*, that the OCAW Plaintiffs are not third-party beneficiaries to the lease and sublease agreements, that the Court has no personal jurisdiction over CROET, and that the OCAW Plaintiffs do not have standing to bring claims against CROET.

■ The Court must engage in a two-part inquiry before determining whether it has personal jurisdiction over a non-resident: first, the Court must determine that the state's long-arm statute authorizes jurisdiction; if so, then the Court must decide whether the exercise of jurisdiction is constitutionally permissible. *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 930 (D.C.Cir.1981). The plaintiff has the burden

---

8. Although Plaintiffs base Count II of their Amended Complaint on the Fifth Amendment, that claim also fails for substantially the reasons discussed above. In Count II, Plaintiffs claim that Section 3161 confers upon them a property interest. The language of Section 3161 is so discretionary, however, that it cannot be read to create a legal entitlement, or property interest, in a hiring preference. Plaintiffs have thus not stated "an invasion of a legally protected interest" which can be "redressed by a favorable decision". *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130.

9. Defendants argue strongly that Plaintiffs also fail to satisfy the first element required for stand-

ing, as they have not established an injury in fact. (Peña Mot. to Dismiss at 17–18; BNFL Mot. to Dismiss OCAW Am. Compl. at 13.) Plaintiffs respond that they have "suffer[ed] a constitutionally cognizable injury by the loss of *an opportunity to pursue a benefit*". (OCAW Opp'n, Peña Mot. to Dismiss, at 34, quoting *CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C.Cir. 1989) (emphasis in original).) Since it is clear that Plaintiffs have failed to establish the third element required for standing, the Court declines to undertake the factual and legal analyzes necessary to decide whether Plaintiffs have satisfied the first required element.

of demonstrating the factual bases for personal jurisdiction, and must allege specific facts that connect the defendant with the forum state without relying on bare allegations or conclusory statements. *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1378 (D.C.Cir.1988).

In this case, Plaintiffs argue that the "transacting business" provision of the District of Columbia long-arm statute subjects CROET to the Court's jurisdiction. The provision states that a "District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—(1) transacting any business in the District of Columbia". D.C.Code § 13–423(a)(1). The provision also states that, when jurisdiction over a defendant is based only on § 13–423,[10] the plaintiff's claims must arise from the acts forming the basis for personal jurisdiction. *Id.* at § 13–423(b).

After conducting limited discovery on the issue of the Court's personal jurisdiction over CROET, Plaintiffs allege that CROET principals "have visited the District of Columbia on behalf of CROET on at least six occasions within the past two years" in order to meet with members of the U.S. Senate or Senate staff, individuals representing the DOE, or other reuse organizations. Plaintiffs have summarized all of these contacts in some detail in their Opposition to CROET's Motion to Dismiss at 4–7. The Court will not address or consider those visits that are clearly unrelated to the Plaintiffs' claims in this case. It will discuss, however, each of the visits that might possibly be construed as related to the claims made in this case.

Plaintiffs note that CROET is the recipient of a grant of approximately $6.0 million that is administered by DOE's Office of Worker and Community Transition. They allege generally that the grant is "[i]n furtherance of the conduct that is at issue in this case". (OCAW Opp'n to CROET Mot. to Dismiss at 4–5.) Plaintiffs allege that "[i]n furtherance of CROET's DOE grant", CROET principals travelled to Washington, D.C.: (1) to attend a reindustrialization and work force transition conference sponsored by DOE at DOE headquarters; (2) to attend an Energy Communities Alliance conference and meet with an aide of U.S. Senator Fred Thompson; (3) to meet with a DOE official "to discuss a recycling project in Oak Ridge"; (4) to attend a conference sponsored by the EPA; and (5) to meet with DOE officials "concerning the Oak Ridge, Tennessee metals recycling program." (*Id.* at 4–7.)

CROET argues that these contacts with the District of Columbia are wholly unrelated to Plaintiffs' claims in this lawsuit. Instead, its trips to Washington, D.C. "were for the purpose of meeting with DOE and Congressional staffers concerning CROET's general activities and funding." (CROET Reply at 9.)

The Court finds that, despite Plaintiffs' characterization of the visits as "in furtherance of CROET's DOE grant", there is no evidence that Plaintiffs' breach of contract claims arise from these contacts. Plaintiffs' claims are based on the leases and subleases between the DOE and CROET for property in ORR; attendance at conferences and meetings regarding other recycling projects do not meet the "arising from" standard. For this reason, the Court has no personal jurisdiction over CROET [11] and Count V of

10. CROET notes that "Plaintiffs do not assert that any other provision in the D.C. long arm statute... confers personal jurisdiction over CROET". (CROET Reply at 6 n.6.)

11. CROET, relying on *Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C.Cir.1983), argues that its contacts with DOE officials, and Congressional or Senate staff members fall within the "government contacts" exception to the long-arm statute. The government contacts exception traditionally exempted from consideration as business transactions those contacts of a non-resident defendant made solely with the federal government. CROET neglects to mention, however, the *Naartex* Court's detailed discussion of *Rose v. Silver*, 394 A.2d 1368, 1373–74 (D.C.1978), which apparently limited the exception to activities implicating first amendment rights. *Naartex*, 722 F.2d at 786.

The contours of the government contacts exception in the District of Columbia remain ill-defined. *See, e.g., Dooley v. United Technologies Corp., et al.*, 786 F.Supp. 65, 77 (D.D.C.1992) ("seeking the government's aid for business[] is an exercise of commercial free speech and, therefore, qualifies for the government contacts exception"); *Johns v. Rozet*, 770 F.Supp. 11, 19

Plaintiffs' Amended Complaint must thus be dismissed pursuant to Fed.R.Civ.P. 12(b)(2).[12]

### D. Environmental Claims

The OCAW Plaintiffs seek to restrain Defendants from undertaking the D & D at ETTP until DOE issues an EIS, which they claim is required by NEPA. According to Plaintiffs, NEPA requires the DOE, before commencing the cleanup, to assess the environmental impact of both the D & D and the proposed recycling and sale of metals into commerce. (OCAW Am. Compl. ¶¶ 142–46.)

Plaintiff–Intervenors do not seek to enjoin Defendants from undertaking the D & D, but they do seek to enjoin the planned recycle and release into commerce of metals recovered from ETTP until the DOE releases an EIS assessing the environmental impact of that portion of the cleanup project. (NRDC Am. Compl. at 31.)

Both Plaintiffs and Plaintiff–Intervenors allege that the planned recycle and release of recovered metals constitutes a "major federal action which will significantly affect the quality of the human environment". (OCAW Am. Compl. ¶ 80; NRDC Am. Compl. ¶ 87 .)

### 1. Statutory Background

 NEPA requires a detailed EIS before a major federal action that significantly affects the quality of the human environment can be undertaken. 42 U.S.C. § 4332(2)(C). The purpose of the EIS is to determine the environmental impact of, and to consider all reasonable alternatives to, the planned action. NEPA claims are presumptively reviewable under 28 U.S.C. § 1331 in conjunction with the APA. 5 U.S.C. §§ 702–06. APA review is not available, however, when a federal statute specifically precludes judicial review. *Block v. Community Nutrition Insti-*

*tute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA") was enacted primarily to ensure the prompt and efficient cleanup of hazardous waste sites. CERCLA authorizes the federal government to take a response measure whenever there is a release or threatened release of any hazardous substance into the environment. 42 U.S.C. § 9604(a). Response measures may be either "removal" actions or "remedial" actions. 42 U.S.C. § 9601. Removal actions are intended to prevent or minimize any immediate risks posed by the release of hazardous substances, while remedial actions are intended to be permanent remedies taken instead of or in addition to removal actions. *Id.*

### 2. Standing

 In order to establish standing, Plaintiffs and Plaintiff–Intervenors must demonstrate (1) injury in fact—the invasion of a legally protected interest which is both "concrete and particularized" and "actual or imminent", (2) traceable to Defendants' conduct, and (3) which can be remedied by this Court. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Moreover, when a litigant alleges a procedural violation by an agency, that litigant must establish that the procedural requirement was "designed to protect some threatened concrete interest particular to the litigant." *Florida Audubon Society v. Bentsen,* 94 F.3d 658, 664 (D.C.Cir.1996), quoting *Lujan,* 504 U.S. at 573 n. 8, 112 S.Ct. 2130.

The OCAW Plaintiffs state that OCAW members and the individual Plaintiffs live and work near the ETTP. Specifically, the members of OCAW Local 3–288 work or have worked at ORR; Plaintiff Claude J.

(D.D.C.1991) ("The exception is available only to parties whose sole contact with the District of Columbia arose out of dealing with a federal instrumentality on a subject unique to the government... [The government contacts exception does not apply to] discussions with HUD regarding the rehabilitation of [a] property, which is not a uniquely governmental function"). For this reason, and because it is clear that Plaintiffs' claims do not arise from CROET's contacts with

the District, the Court declines to rest its decision on personal jurisdiction on that basis.

12. Although Plaintiffs style Count V as "All Plaintiffs v. DOE Defendant and CROET", Plaintiffs seek injunctions only against CROET. Furthermore, under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over any claim against the United States which is "founded upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Cumbie lives in Oak Ridge; Plaintiff Michael Church works in Oak Ridge; the other individual OCAW Plaintiffs allegedly "work and reside in and around the ORR K–25 facility". (OCAW Am. Compl. ¶¶ 7–12.)

Plaintiffs assert that the D & D project involves hazardous work and could result in an "incident of nuclear criticality"[13]. They also assert that an EIS would, *inter alia*, require Defendants to consider safer alternatives. (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 52–53.)

Plaintiff–Intervenors also allege that many of its members live in or near Oak Ridge and the ORR. Specifically, NRDC's membership includes 3,525 members in Tennessee, 135 members within a 25–mile radius of ORR and the ETTP site, and over 60 members in Oak Ridge itself. (NRDC Am. Compl. ¶ 4.) Plaintiff–Intervenor Oak Ridge Environmental Peace Alliance has over 600 members, "many" of whom live within a 20–miles radius of ORR. (*Id.* ¶ 6.) Plaintiff–Intervenor Coalition for a Healthy Environment has approximately 25 active members comprising present and former employees at ETTP as well as residents "living in the nearby vicinity" of ETTP. (*Id.* ¶ 7.) Plaintiff–Intervenor Nuclear Information and Resource Service has approximately 19 members in the state of Tennessee, "several of whom live in the immediate geographical area of Oak Ridge." (*Id.* ¶ 9.)

Plaintiffs and Plaintiff–Intervenors both allege that their individual members have suffered or will suffer environmental and physical harm caused by potential contamination of their local water and air supplies, by the release of contaminants from the proposed recycling, by a potential nuclear criticality event occurring during the recycling, aesthetic harm, and harm caused by the use of potentially contaminated consumer products which will be recycled and released into unrestricted commerce. (OCAW Am. Compl. ¶ 80; NRDC Am. Compl. ¶¶ 81–82.)

Plaintiffs and Plaintiff–Intervenors allege that the relief they seek, issuance of an EIS, will require the DOE to "assess the potential environmental impacts of this major federal action on the human environment, and rigorously evaluate all reasonable alternatives that would result in lower risks to public and worker health, safety and the environment." (NRDC Am. Compl. ¶ 76.)

Finally, the OCAW Plaintiffs and NRDC Plaintiff–Intervenors have asserted that their injuries are precisely the types of injuries contemplated by NEPA in its EIS requirements. *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

 The Court finds that Plaintiffs and Plaintiff–Intervenors have both established injury in fact—their members live and/or work near the cleanup site and would be directly harmed by contamination of the air, water, or products released as a result of the D & D and/or the recycling.

 Plaintiffs and Plaintiff–Intervenors have also satisfied the second standing requirement—the harms they allege are "traceable" to Defendants' conduct. First, they allege that human health and safety as well as the environment in and near ORR could be compromised by DOE's failure to consider alternatives to the recycling and release of recovered metals. The release of these metals "could cause serious health threats . . . absent the serious consideration which the EIS process insures." (NRDC Am. Compl. ¶¶ 84–85; *see also* OCAW Am. Compl. ¶ 87.) Second, Plaintiffs and Plaintiff–Intervenors note that an EIS would fully analyze the impact on the environment of, and alternatives to, the proposed recycling and release. They allege that this information is essential to their purpose of educating their "members and the public with respect to DOE nuclear facilities." (NRDC Am.

---

**13.** "In a nuclear criticality event, an assemblage of enriched uranium results in a self-sustaining chain reaction generating large amounts of heat, radioactive fission products, and gamma and neutron radiation . . . The burst of neutrons that occurs during such an event can be lethal to anyone exposed." (OCAW Am. Compl. ¶ 82;

NRDC Am. Compl. ¶ 47, quoting "Affordable Cleanup? Opportunities for Cost Reduction in the Decontamination and Decommissioning of the Nation's Uranium Enrichment Facilities", National Academy of Science Report at 297–98 (1996).)

Compl. ¶ 83; *see also* OCAW Am. Compl. ¶ 88.)

Defendants, relying on *Florida Audubon Society,* 94 F.3d at 662, argue that "the alleged harm to plaintiffs in this case is so attenuated, and requires so many undefined events and third-party interactions to make it speculative at best, and certainly outside the chain of events necessary to establish standing." (Peña Mot. to Dismiss at 35.) The facts of *Florida Audubon,* however, are very different. In *Florida Audubon,* the plaintiffs, an environmental group, claimed that a tax credit for ethyl tertiary butyl ether fuel additive would stimulate the overproduction and overcultivation of several crops, which in turn would harm wildlife areas enjoyed by plaintiffs' members. The harm alleged here by Plaintiffs and Plaintiff–Intervenors is neither as "attenuated" nor as "speculative" as that alleged in *Florida Audubon.*

NRDC Plaintiff–Intervenors describe the recycling process and its potential effects in some detail: [14] NRDC notes that BNFL and its subcontractor Manufacturing Sciences Corporation ("MSC") plan to use "grit blasting" technology to recycle the radioactively contaminated steel removed from ETTP. (NRDC Am. Compl. ¶ 37.) It states that the process potentially produces spent steel grit which is radioactively contaminated and would require disposal at a licensed radioactive waste disposal facility. BNFL and MSC plan to use "wet chemical decontamination" to recycle the radioactively contaminated copper and aluminum removed from ETTP. That process produces both liquid and solid wastes, which must be treated and disposed of. (*Id.* ¶ 38.)

Finally, BNFL and MSC plan to use a new electrorefining technology to recycle the recovered nickel, the most valuable of the scrap metals to be removed (approximately 6,000 tons). (*Id.* ¶¶ 42, 50.) First, they will melt the nickel into ingots. The melting process itself produces air emissions and radioactive wastes. BNFL and MSC then plan to use an electrorefining process (which NRDC claims "has never been commercially demonstrated, and in fact has not yet progressed beyond the 'pilot' stage", *Id.*) to remove contaminants. The electrorefining process will create solid wastes containing radioactive technetium, as well as liquid wastes.

NRDC states that "MSC is now conducting additional demonstration work in order to finalize the design of the electrorefining process." (*Id.* ¶ 43.) NRDC also points out that BNFL and MSC have not yet obtained all necessary construction and operation permits needed in order to begin the electrorefining process. Construction of the electrorefining equipment will require approximately one year after necessary permits have been obtained, and the electrorefining process itself will take four to five years. (*Id.* ¶ 45.)

NRDC warns that the nickel is currently volumetrically radioactively contaminated.[15] It states that there are no state or federal volumetric standards that would limit the permissible amount of such volumetric contamination in consumer products. (*Id.* ¶ 50.) NRDC states that "BNFL is considering an agreement with Ovonics Corporation to recycle the [ostensibly decontaminated but potentially] radioactive nickel into nickel hydride batteries", and notes that nickel is a primary ingredient in the manufacturing of stainless steel. (*Id.* ¶¶ 51–52.)

In short, unlike the plaintiffs in *Florida Audubon,* Plaintiffs and Plaintiff–Intervenors, by virtue of their proximity to the cleanup site, will, at a minimum, be directly affected by the potential generation and release of hazardous and/or radioactive waste into the environment in and around ORR. Thus, Plaintiffs and Plaintiff–Intervenors have satisfied the second standing requirement—the harms they allege are readily "traceable" to Defendants' conduct.

■■■ Plaintiffs and Plaintiff–Intervenors have also satisfied the third requirement for standing by establishing that the relief they

---

14. Defendants do not contest the accuracy of NRDC's discussion of the proposed recycling project.

15. Volumetric contamination occurs when radioactive contamination is distributed throughout the entire volume of a metal, as opposed to only the surface. (NRDC Am. Compl. ¶ 50.)

seek, completion of an EIS, can remedy their alleged injuries. OCAW and NRDC have established that DOE's failure to promulgate an EIS will harm their organizations' informational interests as each organization has, as a major purpose, the education of its members and the public with respect to actions at DOE nuclear facilities. (OCAW Am. Compl. ¶ 88; NRDC Am. Compl. ¶ 83.)

 Finally, Plaintiffs and Plaintiff–Intervenors must establish that they are within the "zone of interests" which NEPA seeks to protect. The Court must thus determine "whether Congress intended for [this] particular class of plaintiffs to be relied upon to challenge unlawful agency action or inaction." *Clarke v. Securities Assn.*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). By establishing that their members live or work in close proximity to ORR and that their organizations' goals are to protect the health of their members and the environment through, *inter alia*, the dissemination of information, Plaintiffs and Plaintiff–Intervenors have established that they are within the "zone of interests" which NEPA seeks to protect.

Both the OCAW Plaintiffs and the NRDC Plaintiff–Intervenors have thus satisfied the *Lujan* standing requirements. Both have established that they have associational standing. Finally, both have established that they are within the "zone of interests" protected by NEPA. Therefore, the Court concludes that Plaintiffs and Plaintiff–Intervenors have standing to bring their claims under NEPA.

**3. D & D and recycling actions at ETTP**

 Under CERCLA § 113(h), federal courts have no jurisdiction to review challenges to removal or remedial actions until those actions have been completed. 42 U.S.C. § 9613(h); *see Schalk v. Reilly*, 900 F.2d 1091, 1095 (7th Cir.1990) ("The obvious meaning of this statute is that when a remedy has been selected, no challenge to the cleanup may occur prior to completion of the remedy"); *Alabama v. EPA*, 871 F.2d 1548 (11th Cir.1989), *cert. denied*, 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989). Thus, if the D & D of the three buildings at ETTP and the planned recycling of materials from those buildings constitute uncompleted CERCLA removal or remedial actions, then the Court has no jurisdiction to adjudicate Counts VII–IX of OCAW's Complaint (which contest both the D & D and the recycling projects) or Plaintiff–Intervenor's Amended Complaint (which contests only the proposed recycling and release of recovered metals).

**a. The D & D at ETTP**

 The OCAW Plaintiffs argue that the D & D component of the cleanup project should not proceed without the completion of an EIS. Plaintiffs argue that the D & D does not constitute a CERCLA response action and thus CERCLA's Section 113(h) does not preclude Plaintiffs from securing an EIS for that portion of the work. (OCAW Opp'n, Peña & BNFL Mots. to Dismiss at 64.) OCAW argues that the funds to be used for the D & D cannot be used for a CERCLA response action,[16] the D & D was not "ordered",[17] issuance of an EIS would not interfere with the D & D because of the non-time-critical nature of the project, and finally, that DOE rules contemplate an EIS for the D & D of its uranium enrichment facilities. (*Id.*)

 The evidence in the record does not support Plaintiffs' arguments. The FFA entered into by the DOE, EPA and the TDEC provides a framework for addressing and remediating the environmental impact of past and present activities at ORR. It affirms DOE's authority to conduct removal actions

---

**16.** OCAW notes that the D & D is funded by the Uranium Enrichment Decontamination and Decommissioning Fund, which was established by the Energy Policy Act of 1992, 42 U.S.C. § 2297(a)-(h), *et seq.* OCAW argues that the term "decontamination and decommissioning", as defined by the Fund's enabling legislation, excludes CERCLA response actions. 42 U.S.C. § 2297. Notwithstanding this argument, the Court finds, below, that the evidence overwhelm-

ingly demonstrates that the proposed D & D at ETTP is to be conducted as a CERCLA removal action.

**17.** In order for a measure to be considered remedial so as to be preempted by Section 113(h), the measure must first have been "ordered as part of the remedial plan". *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir.1991).

pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604. (FFA at 34.) The DOE determined that the action should be conducted as a non-time critical removal action and has accordingly prepared an EE/CA to assess the proposed action, as required by the NCP, 40 C.F.R. 300.415(b)(4).

Defendants state that the purpose of the D & D is the remediation of Buildings K–29, K–31, and K–33 through the "removal of contaminant sources from these three facilities to address threatened releases to the environment". (EE/CA at 1–5.) This includes, *inter alia*, removal of all process equipment from the three buildings, removal of all gaseous diffusion units from the three buildings, and completion of the decontamination of the buildings. (NRDC Am. Compl. ¶ 22.) As such, the scope of the D & D certainly falls within the statutory definition of removal: "cleanup or removal of released hazardous substances from the environment... the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment". 42 U.S.C. § 9601(23).

The FFA, the EE/CA, and the Final Statement of Work all indicate that DOE intends the D & D project to proceed as a CERCLA removal action and repeatedly discuss compliance with the provisions of CERCLA. EE/CA at 1–5 & 1–6; Final Statement of Work, Ex. 4, Pl.'s Opp'n Defs.' Mot. to Dismiss, Att. A at 22 ("[t]he work under this contract will be conducted as a Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) Non–Time–Critical Removal Action.") The facts clearly demonstrate that the D & D of buildings and equipment at ETTP constitutes a removal action under CERCLA.

Since the D & D of the three buildings at ETTP constitutes an uncompleted CERCLA removal action, the Court has no jurisdiction under Section 113(h) to adjudicate those portions of Counts VII—IX of Plaintiffs' Amended Complaint that seek declaratory or injunctive relief related to the D & D if those claims constitute "challenges" to the removal action.

Count VII of Plaintiffs' Amended Complaint seeks a broad Order "that the activities as alleged in this Complaint constitute a major federal action" for which an EIS is required. Counts VIII and IX seek an injunction "barring the DOE and BNFL from performing any action related to the D & D of Buildings K–29, K–31 and K–33 or the scrap metals recycling project" until the DOE has promulgated an EIS.

The imposition of an order requiring the Secretary to issue an EIS constitutes precisely the kind of interference with the removal action that Congress sought to avoid by enacting CERCLA § 113(h). *See McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 330 (9th Cir.1995). The OCAW Plaintiffs' lawsuit thus qualifies as a "challenge" to the D & D at ETTP and is barred by CERCLA's Section 113(h). 42 U.S.C. § 9613(h).

Consequently, the Court will grant summary judgment in favor of Defendants on those portions of Counts VII—IX of Plaintiffs' Amended Complaint that seek declaratory or injunctive relief related to the D & D.

#### b. Recycling and release of decontaminated metals

Plaintiff–Intervenors NRDC contend that the recycling and sale of metals do not fall within the statutory definition of "removal", because they involve the further distribution of allegedly hazardous substances into the environment rather than their cleanup or removal. NRDC also argues that, since the recycling and sale of the metals is optional rather than mandatory, these activities cannot be considered "an organic element" of the removal action at ETTP.

Defendants respond that the recycling of the recovered nickel, aluminum, stainless steel, and copper from the K–29, K–31, and K–33 Buildings does, along with the D & D, constitute an integral part of the CERCLA removal action under § 104.

The Seventh Circuit in *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991),[18] evaluated whether an action constituted a removal or remedial action and thus

---

**18.** Our Circuit has not directly addressed this issue.

fell outside the reach of federal jurisdiction. It reasoned that:

> [T]he purpose of section 113(h) is to prevent litigation from delaying remediation. We hold that a measure that is ordered as part of a remedial plan, and that is *reasonably related to the plan's objectives* so that it can fairly be considered an *organic element* of the plan, is itself remedial within the meaning of section 113(h).

(emphasis added).[19] Defendants also cite *Heart of America Northwest v. Westinghouse Hanford Co.*, 820 F.Supp. 1265, 1279 (E.D.Wash.1993), where the court, following *North Shore*, employed a similarly broad construction of Section 113(h).

While NRDC argues that the *North Shore* test applies only to remedial actions (and is therefore inapplicable to the removal action at issue here), the Court nevertheless concludes that the fairly broad definition of "removal" in the statute itself ("other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment", 42 U.S.C. § 9601(23)) warrants broad construction of the term, as it is used in Section 113(h).

■ Thus, in determining whether the proposed recycling is part of the removal action, the Court will consider whether it has been (1) ordered as part of the remedial plan, (2) is reasonably related to the plan's objectives and (3) can fairly be considered an organic element of the plan.

Section 4.3 of the EE/CA, "Selection of Recommended Alternative" states that "Alternative 2" was selected because "[t]his alternative is the most effective... in meeting the purpose and objectives of this removal action. Implementing Alternative 2 will... support the programmatic waste minimization goal by releasing materials for reuse and/or recycle". (EE/CA at 4–10 & 4–11.)

It is thus reasonable to conclude that recycling was "selected" as part of the remedial plan, but it was clearly not ordered, since the recycling component of the project is not mandatory.

Section 1.2 of the EE/CA, "Purpose and Scope", however, discusses only the threat to human health and the environment from potential releases of radiological and hazardous substances from Buildings K–29, K–31, and K–33. It states that the planned "removal of contaminant sources from these three facilities to address threatened releases to the environment complies with CERCLA." The issue, then, is whether the proposed recycling is "reasonably related" to either the specific objective of the removal action here (the reduction of the risk of potential releases from the three buildings) or the general goal of CERCLA removal actions of preventing damage to the public health, welfare, or environment. 42 U.S.C. § 9601(23).

■ As discussed earlier, the DOE has awarded to BNFL title to all property which it dismantles or demolishes under the contract (except property which DOE specifically designates it is retaining), including an estimated 112,000 tons of contaminated nickel, aluminum, stainless steel and copper. (NRDC Am. Compl. ¶ 26.) The DOE/BNFL contract and the EE/CA both encourage the recycling and sale of the recovered metals. Significantly, however, neither document requires such recycling. To the contrary, the EE/CA merely states that "[d]isposition of equipment and scrap metal will take advantage of recycling, reuse, or unrestricted release *when possible and economically feasible.*" (EE/CA at 4–2 (emphasis added).) If BNFL determines that recycling and sale of the metals is not economically advantageous, title to the metals will revert back to DOE. (NRDC Am. Compl. ¶¶ 27–28.)[20]

**19.** *North Shore* has been favorably cited by several district and circuit courts. *See, e.g., McClellan Ecological Seepage Situation, et al. v. Perry*, 47 F.3d 325, 328 (9th Cir.1995); *Arkansas Peace Center, et al. v. Arkansas Dept. of Pollution Control and Ecology, et al.*, 999 F.2d 1212, 1217 (8th Cir.1993); *Heart of America Northwest v. Westinghouse Hanford Co.*, 820 F.Supp. 1265, 1279 (E.D.Wash.1993); *Employers Insurance of Wau-*

*sau, a Mutual Co. v. Bush, et al.*, 791 F.Supp. 1314, 1321 (N.D.Ill.1992).

**20.** Defendants do not contest this fact, although they note only that DOE "has agreed to compensate BNFL should there by any unexpected drop in the market price of the[] metals." (Peña Reply at 18, citing Statement of Work OCAW Opp'n, Ex. H, at H–14.)

Given that the recycling of the recovered metals will occur only if it serves BNFL's economic advantage, the Court cannot accept Defendants' argument that the "recycling of salvaged equipment and scrap metal is an integral, organic, and essential part of the ETTP removal project." (Peña Reply in Support of Mot. to Dismiss at 17.)

NRDC notes that DOE has granted BNFL complete discretion to determine whether it will recycle materials, when it will recycle them, and by what methods. The Court thus finds persuasive NRDC's argument that, given that BNFL is free to abandon the recycling activities if it finds them unprofitable, these activities cannot be considered "organic elements" of the plan. A purely discretionary decision—whether or not to recycle—can hardly be deemed "an organic element" of the removal plan. For this reason, the Court concludes that the optional recycling of metals is not part of the CERCLA removal plan. The cases cited by Defendants do not discuss such optional and discretionary actions by private entities and are thus unpersuasive. *See, e.g., McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325 (9th Cir.1995); *Nevada v. O'Leary*, No. CV–S–94–576–PMP (D.Nev. Jan. 12, 1995).

Since the proposed recycling of equipment and scrap metal recovered from the three buildings is not part of the removal action, a challenge to these activities is not barred by § 113(h). The removal action, or the D & D portion of the cleanup activities, may proceed as planned.

Defendants' Motions to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint, and those portions of Counts VII—IX of OCAW Plaintiffs' Amended Complaint that seek declaratory or injunctive relief related to the recycling and resale of recovered metals, must thus be denied, and these claims will go forward.

## III. Conclusion

Upon consideration of the Motions, Oppositions, Replies, Surreplies, and the entire record contained herein, and for the reasons discussed above, the Federal Defendant's Motion to Dismiss Plaintiffs' Amended Complaint [# 54] is **granted in part and denied in part**; Defendant British Nuclear Fuels, Inc.'s ("BNFL") Motion to Dismiss Plaintiffs' Amended Complaint [# 18] is **granted in part and denied in part**; Defendant CROET's Motion to Dismiss Plaintiffs' Amended Complaint [# 39] is **granted**; Defendant CROET's Motion to Change Venue [# 39] is **denied as moot**; Defendant CROET's Motion to Sever the Claims Against It [# 64] is **denied as moot**; Defendant–Intervenor Building and Construction Trades Department, AFL–CIO and the Knoxville Building and Construction Trades Council, AFL–CIO's (collectively "Building Trades") Motion to Dismiss Plaintiffs' Amended Complaint [# 61] is **granted in part and denied in part**; Defendant BNFL's Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 80] is **denied**; Federal Defendant's Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 81] is **denied**; and the Building Trades' Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 81] is **denied**. An Order will issue with this Opinion.

### ORDER

The Department of Energy ("DOE") and several of its contractors have undertaken the cleanup of a hazardous waste site at the Oak Ridge Reservation ("ORR") in Oak Ridge, Tennessee. ORR was for many years used for nuclear weapons research and development. Plaintiffs Oil, Chemical & Atomic Workers International Union, AFL–CIO ("OCAW"), OCAW Local 3–288, and several individual OCAW members (collectively "OCAW Plaintiffs" or "Plaintiffs") allege that the cleanup, or decontamination and decommissioning ("D & D"), should not proceed until the Defendants have promulgated an Environmental Impact Statement ("EIS"), which the Plaintiffs claim is required by the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) ("NEPA"). Plaintiffs also allege that the second phase of the project, the recycling and sale of recovered scrap metal, should not proceed until the DOE has issued an EIS to determine the

environmental impact of that portion of the cleanup activities.

Plaintiff–Intervenors Natural Resources Defense Council ("NRDC"), Oak Ridge Environmental Peace Alliance, the Coalition for a Healthy Environment, and the Nuclear Information and Resource Service (collectively "NRDC Plaintiff–Intervenors" or "Plaintiff–Intervenors") present a narrower claim, namely that only a portion of the cleanup activities—the proposed recycling and resale of materials recovered from the site—is covered by NEPA and therefore should not proceed absent an EIS.

The OCAW Plaintiffs also allege that, since the cleanup activities at ORR require a major workforce restructuring, the DOE and its contractors are required to comply with the requirements of Section 3161 of the National Defense Authorization Act for Fiscal Year 1993, 42 U.S.C. § 7274h ("Section 3161"). Plaintiffs allege that DOE and its contractors have failed to fulfill various Section 3161 obligations.

This matter is now before the Court on the Defendants' Motions to Dismiss Plaintiffs' and Plaintiff–Intervenors' Amended Complaints and Defendant Community Reuse Organization of East Tennessee's ("CROET") Motion to Change Venue and Motion to Sever the Claims Against It.

Upon consideration of the Motions, Oppositions, Replies, Surreplies, and the entire record contained herein, and for the reasons discussed above, it is hereby

ORDERED, that the Federal Defendant's Motion to Dismiss Plaintiffs' Amended Complaint [# 54] is **granted in part and denied in part**; Defendant British Nuclear Fuels, Inc.'s ("BNFL") Motion to Dismiss Plaintiffs' Amended Complaint [# 18] is **granted in part and denied in part**; Defendant CROET's Motion to Dismiss Plaintiffs' Amended Complaint [# 39] is **granted**; Defendant CROET's Motion to Change Venue [# 39] is **denied as moot**; Defendant CROET's Motion to Sever the Claims Against It [# 64] is **denied as moot**; Defendant–Intervenor Building and Construction Trades Department, AFL–CIO and the Knoxville Building and Construction Trades

Council, AFL–CIO's (collectively "Building Trades") Motion to Dismiss Plaintiffs' Amended Complaint [# 61] is **granted in part and denied in part**; Defendant BNFL's Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 80] is **denied**; Federal Defendant's Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 81] is **denied**; and the Building Trades' Motion to Dismiss NRDC Plaintiff–Intervenors' Amended Complaint [# 81] is **denied**. It is further

ORDERED, that a Status Conference will be held on **Tuesday, June 23, 1998, at 9:30 a.m.**, in Courtroom 19.